**HOFFMANN–LA ROCHE, INC.,**
**Plaintiff,**

v.

**Patricia Roberts HARRIS et al., Defendants.**

**AMERICAN HOSPITAL SUPPLY CORPORATION et al., Plaintiffs,**

v.

**Patricia Roberts HARRIS et al., Defendants.**

**PHARMACEUTICAL MANUFACTURERS ASSOCIATION, Plaintiff,**

v.

**Patricia Roberts HARRIS et al., Defendants.**

**Civ. A. Nos. 79–1650, 79–2318 and 79–2516.**

United States District Court, District of Columbia.

Dec. 20, 1979.

Stuart J. Land, Leonard B. Simon, Maxwell J. Mehlman, Cary A. Adams, Arnold & Porter, Washington, D. C., Rodney R. Munsey, Frank E. Samuel, Jr., Munsey & Samuel, Washington, D. C., Joel E. Hoffman, Anthony L. Young, Wald, Harkrader & Ross, Washington, D. C., for plaintiffs.

Patricia J. Kenney, Asst. U. S. Atty., Civ. Div., Washington, D. C., for defendants.

MEMORANDUM

OBERDORFER, District Judge:

Plaintiffs are two leading manufacturers of pharmaceutical drugs and the Pharmaceutical Manufacturers' Association (PMA).* They sue the Food and Drug Administration (FDA) of the Department of Health and Welfare to prevent FDA from approving any application by a competing drug manufacturer for the right to market a generic version of a drug previously approved by FDA, unless the competing applicant has filed reports of clinical tests of that drug and the "raw data" underlying those tests is available to the FDA. Intervenor Internal Medications, Inc. (IMS), a potential competitor of one of the plaintiffs, has won FDA approval of an application covering a generic version of a drug pioneered by that plaintiff, without supplying fresh clinical reports and "raw data". IMS is aligned here with the defendants.

The cases have evolved through extended briefing, oral argument, post-argument submissions of proposed findings of fact, and finally, a proposed order, submitted jointly by all three plaintiffs. That proposed order would declare that a July 31, 1978, memorandum from Marion J. Finkel, M. D., Associate Director for New Drug Evaluation, to Division Directors in the Bureau of Drugs to the effect that FDA would approve post–1962 duplicate new drug applications in reliance on published reports without fresh clinical investigations or available "raw data,"[1] was a rule adopted without notice or opportunity for comment as required by the Administrative Procedure Act (APA) (5 U.S.C. § 553) and FDA regulations (21 C.F.R. § 10.40). The proposed order would also declare that, treated as a rule, the

---

* Until November, 1977, when I became a judge, I was a member of a law firm which represented PMA in a number of matters. 28 U.S.C. § 455(b)(2) requires a judge to disqualify from a case "[w]here in private practice [the Judge] served as a lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter . . . ." PMA is represented here by another firm, and the complaint was filed in June of 1979. Counsel were fully aware of the foregoing facts as a result of my disclosure of my former affiliation on the record and independently. Transcript of Proceedings, October 18, 1979, pp. 23–24. Accordingly, I find that I am not disqualified.

1. Plaintiffs' Exhibit 1 (hereinafter cited as "Finkel memorandum").

Finkel memorandum violates the Food, Drug, and Cosmetic Act (the Act) and FDA regulations promulgated thereunder.

The matter is now before the Court on plaintiffs' motions for a preliminary injunction and cross-motions by the parties, including intervenor, for summary judgment. For reasons more fully stated below, the Court concludes that plaintiffs have failed to invoke or exhaust their remedy under APA Section 553(e) to petition the FDA Commissioner for a decision as to whether:

(1) the Finkel memorandum should be issued as a rule or is a general statement of policy, exempt from the notice and comment requirement of APA and FDA regulations, and

(2) any provision of the Act or any regulation requires that an applicant for approval of the safety and efficacy of a generic version of a previously-approved drug support that application by filing or making available fresh clinical studies and "raw data," where there are full reports of investigations in published literature evidencing the safety and efficacy of the previously-approved drug.

Therefore, summary judgment will be entered for defendants.

I

Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 355, no person may market any new drug unless that person has obtained an approved "new drug application" (NDA) from the Food and Drug Administration. The FDA may not approve an NDA unless, *inter alia*, it has substantial evidence of the safety and efficacy of the drug in question. Over the years since 1962, FDA has processed thousands of applications for approval of "new drugs."

Many of these applications relate to drugs which were never before marketed. They came to FDA for approval directly from the laboratory with nothing probative of their safety and efficacy except reports of laboratory and clinical experience and published literature about that experience.

Other applications relate to generic versions of drugs previously marketed by their pioneer manufacturer, or previously marketed for a different purpose. Some of these duplicate applications relate to drugs already on the market in 1962 when Congress amended the Food, Drug and Cosmetic Act to require FDA approval of the efficacy (in addition to the safety) of all drugs. Other (and fewer) duplicate applications relate·to new manufacturers or new uses of previously-approved drugs originally approved and marketed for the first time after 1962 (post–1962 drugs). These latter duplicate applications for approval of new manufacturers or new uses of post–1962 drugs have only recently begun to appear at FDA; patents issued in 1962 expire in 1979.

With respect to new drugs not previously marketed, FDA has almost universally required the pioneer applicant to support its application with detailed clinical reports of safety and effectiveness studies verified, or verifiable, by "raw data" as described in 21 C.F.R. § 314.1(c)(2)12c. This regulation states that a new drug application

"should include adequate information concerning each subject treated with the drug or employed as a control . . . and a statement of where the underlying data are available for inspection."

Since 1963, nevertheless, FDA has approved thousands of applications by plaintiffs, PMA members and others for approval of generic versions of previously-approved drugs marketed before 1962 in reliance primarily upon published reports about them and the opinion of the National Science Foundation or the National Research Council. Generally, these pre–1962 applications have not been supported by the clinical reports and "raw data" described in this regulation. 21 C.F.R. § 314.1(c)(2)12c. Although the "raw data" made available by the pioneer applicant is protected and not available as such either to the duplicate applicant or FDA, it is undisputed that the fact that the drug has been approved and marketed without repercussion and has been the subject of published consideration frequently renders the duplicate "raw data" superfluous as a practical matter.

In the last few years, as patents issued to drug manufacturers in the 1960's have approached expiration, FDA has begun to receive an increasing number of applications for approval of generic versions of drugs originally approved *after* 1962. These duplicate applications for approval of so-called post–1962 generic drugs closely resemble duplicate applications for pre–1962 drugs in function. Pioneer versions of both have been previously approved. Both have been tested in the laboratory and in the market place. Both have remained on the market over time: if they were not safe and effective, FDA would presumably have exercised its power and performed its duty to withdraw approval of them. Thus, FDA claims here that it has approved some of those post–1962 duplicate new drugs on the basis of the fact of their prior approval and the fact of their acceptance in the market, plus published reports of adequate and well-controlled investigations, without requiring the applicant to furnish fresh clinical reports or make "raw data" immediately available and that this is an established policy reflected in the Finkel memorandum.

The Finkel memorandum was an internal FDA communication addressed by an FDA Associate Director for New Drug Evaluation to FDA Division Directors "to provide (1) guidance on the requirements that must be met by new manufacturers of post–1962 drugs and criteria for approval of such drugs." The memorandum described the policy of the Associate Director "for Duplicate Drug Products of Post–1962 Drugs" as follows:

A drug marketed for the first time after 1962 under an approved New Drug Application may be marketed by a second firm only after the second firm has received the approval of a full New Drug Application for that product . . . .. Present interpretation of the law is that no data in an NDA can be utilized to support another NDA without express permission of the original NDA holder. Thus, in the case of duplicate NDAs for already approved post–62 drugs, the Agency will accept published reports as the main supporting documentation for safety and effectiveness. The Agency will not interpret the "full reports of investigations" phrase in the law as requiring either case reports or an exhaustive review of all published reports on the drug. Depending upon the quality of the published data, selected preclinical and perhaps additional clinical studies may be required of the new sponsor prior to NDA approval.

An attachment contained "Recommendations" for data to be submitted in support of applications of post–1962 drugs, together with an attachment captioned "Criteria for Approval" of applications for post–1962 drugs. The attachment with respect to recommendations stated, among other things, that:

published reports from scientific journals should encompass papers in which adequate and well-controlled clinical studies are described in detail . . .. The compilation of published reports (pre-clinical and clinical) should be the major papers in the literature relating to the drug and should be 'balanced' and include those demonstrating negative as well as positive findings. Each submitted paper . . . of a clinical trial offered in support of effectiveness should be accompanied by a summary describing the protocol, the results and how the study meets 21 C.F.R. § 314.111(a)(5)(ii), *i. e.*, the essentials of a controlled clinical investigation . . .. If the applicant believes that adequate and well-controlled investigations are not required to provide substantial evidence for safety and effectiveness, then he may petition for . . . a waiver . . .."

The attachment relating criteria for approval stated that "ordinarily" FDA would require "adequate published data derived from two or more adequate and well-controlled clinical trials." The attachment further observed, however, that:

It is not necessary for each labeling claim to be supported by such data if the FDA has determined that it is reasonable to

extrapolate safety and effectiveness data for one or more indications to other indications for use of the drug.

Furthermore, the attachment stated that:

If the duplicate . . . sponsor has petitioned for a waiver from the requirement for submittal of data for adequate and well-controlled studies to support safety and effectiveness of a drug, and the reviewing division is in agreement with this petition, then approval to grant a waiver must be obtained from the Bureau Director prior to approval . . ..
If the Reviewing Division is not in agreement with the petitioner, the petition must be forwarded to the Bureau Director for his decision on whether or not to grant the waiver . . .." [2]

FDA did not issue the Finkel memorandum as a result or order or publish it in the Federal Register. It was circulated internally and apparently made available on an *ad hoc* basis to some drug manufacturers and their counsel. One of the plaintiffs obtained a copy in an FDA response to a Freedom of Information Act request.

Upon obtaining the Finkel memorandum, plaintiffs did not petition FDA to issue, amend or revoke it or to stay approval of other new drug applications being processed in reliance on it.

Plaintiffs do not claim that the Finkel memorandum interferes with or threatens their ability to obtain approval for or otherwise market their products. *Compare, e. g., PMA v. Finch*, 307 F.Supp. 858 (D.Del. 1970).[3] Nor do they claim that the Finkel memorandum or official action taken in reliance on it diminishes in any way the safety or efficacy of drugs now manufactured and marketed by them, by other PMA members or by any other manufacturer. Instead, they have stated with commendable candor in their briefs and in oral argument that on behalf of pioneer manufacturers they object to the Finkel memorandum and any new drug approval granted in reliance on it because a competing manufacturer winning approval of a duplicate product without having borne the expense of the clinical investigation and the "raw data" required of the pioneer applicant will have a less costly product, the marketing of which would place the pioneer applicant at a competitive disadvantage. They claim that it is unlawful and unfair for FDA to expose pioneer manufacturers such as plaintiffs to such competition, and that by doing so FDA will reduce plaintiffs' incentive to engage in future research and development with the result that innovation and new drug development will be retarded. Therefore, they seek protection of their claimed right to be free from "unlawful competi-

**2.** Before the Finkel memorandum was circulated, IMS, intervenor here, filed a duplicate application for the marketing of injectable furosemide, a widely used product originally pioneered by one of the plaintiffs. IMS' duplicate application provided a summary of the pertinent citations to the world's literature, including citations to studies on the product of one of the plaintiffs. The application did not include nor refer to any fresh pre-clinical or clinical investigations because, among other things, according to FDA, the plaintiffs' pioneer version of the product "had been studied and tested by experts throughout the world." Affidavit of Marion J. Finkel, filed October 10, 1979, at 11 ("Finkel affidavit"). Further, according to FDA officials responsible for processing the IMS application:

hundreds of research papers, many of them reporting on the results of adequate and well-controlled investigations, including clinical investigations [of the pioneer product] have been published in scientific and medical journals. These papers describe the chemistry,

pharmacology, toxology, safety and effectiveness of furosemide.
A clinical analysis of the world literature shows that the compound has been subjected to a number of well-controlled studies that demonstrate conclusively that furosemide is a safe and effective drug in the treatment of the conditions for which it is marketed.

Finkel affidavit, pages 11–12.

**3.** *Compare also Joseph v. United States Civil Service Commission*, 180 U.S.App.D.C. 281, 554 F.2d 1140 (D.C. Cir. 1977), where a regulation made effective without notice and comment threatened to inhibit plaintiffs' participation in local elections; and *Wagner Electric Corporation v. Volpe*, 466 F.2d 1013 (3rd Cir. 1972), where an automobile components manufacturer's product was directly affected by a substantive change in an outstanding regulation and the plaintiff unsuccessfully sought administrative relief before filing suit.

tion."[4] For reasons stated below, the Court concludes that plaintiffs could and should have petitioned FDA for the unique protection they claim before seeking judicial intervention.

## II

Administrative law jurisprudence is replete with admonitions to courts not to become involved in specialized adjudications unless and until the responsible agency has had a full opportunity to hear the matter and decide it; even then, the courts' review role should be a muted one. *See, e. g., Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Far Eastern Conference v. United States,* 342 U.S. 570, 574–575, 72 S.Ct. 492, 494–495, 96 L.Ed. 576 (1952).[5] The Supreme Court has strongly emphasized these principles in recognizing in a related context FDA's expertise and primary jurisdiction vis a vis the courts. *See Weinberger v. Hynson, Wescott and Dunning,* 412 U.S. 609, 626–627, 93 S.Ct. 2469, 2481–2482, 37 L.Ed.2d 207 (1973); *Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 645, 654, 93 S.Ct. 2488, 2494, 37 L.Ed.2d 235 (1973). As the Supreme Court stated in *Hynson* :

> The heart of new procedures designed by Congress (in the Food, Drug and Cosmetic Act of 1962) is the grant of primary jurisdiction to FDA, the expert agency it created.

Courts have long recognized, and deferred to, the special competence of the officers of an administrative agency to construe its organic statute. *See, e. g., Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Furthermore, it is established (in this Circuit at least) that FDA, "rather than [the] Court, must be given the first opportunity to evaluate the need for a rule-making proceeding." *Schuck v. Butz,* 163 U.S.App.D.C. 142, 144, 500 F.2d 810, 812 (D.C. Cir. 1974) and cases

there cited. *Compare Prune Bargaining Association v. Butz,* 444 F.Supp. 785 (N.D. Cal.1975), *aff'd,* 571 F.2d 1132 (9th Cir. 1978).

The substantive questions as refined in the proceedings here require a decision as to whether the Finkel memorandum is authorized by statute, and if so, whether it should be issued as a rule or is exempt from notice and rulemaking as a general statement of policy or a statement describing pre-existing FDA practices. *See, e. g., Guardian Federal Savings and Loan Assn. v. Federal Savings and Loan Insurance Corp.,* 191 U.S. App.D.C. 135, 143–46, 589 F.2d 658, 666–69 (D.C. Cir. 1978). These questions should be confronted squarely and decided by FDA before a court addresses them—with the benefit of the FDA decision.

The APA and FDA regulations afford plaintiffs a well-equipped forum in which to raise and make a record on these questions. Section 553(e) of the Administrative Procedure Act provides that:

> Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

FDA regulations faithfully implement the APA by providing that:

> any interested person may petition the Commissioner to issue, amend or revoke a regulation or order or to take or refrain from taking any other form of administrative action, under the law administered by him.

21 C.F.R. § 10.25(a). FDA regulations spell out a form of petition and the procedure pursuant to which the FDA Commissioner would process and rule on it. 21 C.F.R. § 10.25. The filing of such a petition would enable the Commissioner to determine "whether a rule making proceeding is desirable and, if the Commissioner decides that rule making is not warranted, to develop a record relevant to such a decision." *Schuck*

---

4. Plaintiffs also object, on another level, to FDA action on the basis of an unpublished or "secret" rule evidenced by the Finkel memorandum, and to denial of their right to notice and opportunity to comment about a rule affecting their business.

5. *See also* Wright, Judicial Review and the Equal Protection Clause (Francis Biddle Lecture delivered at Harvard Law School, October 16, 1979) pp. 6–13.

*v. Butz, supra,* 163 U.S.App.D.C. at 144, 500 F.2d at 812. Of possibly greater importance here, the FDA regulations also provide a procedure whereby "any interested person may request [the Commissioner] to stay the effective date of any administrative action." 21 C.F.R. § 10.35.

In a proceeding on a petition by plaintiffs, the FDA Commissioner could collect FDA records and the statements of actors themselves as to FDA's prior practice with respect to requiring clinical information and "raw data," and appraise that record according to guidelines established by our Court of Appeals in *Guardian* and related cases. A petition, accompanied by a stay request, would give the Commissioner an opportunity to appraise, from the perspective of his specialized experience, plaintiffs' claims that, as a matter of public interest, they should be free from competition of the kind threatened here in order to improve their ability to provide the public with safe and effective drugs. In this connection the Commissioner could consider any interrelationship between Congress' objectives as expressed in the Act and those reflected in the patent laws with respect to protection of innovators from competition.

Thus, the Administrative Procedure Act and the FDA regulations afford plaintiffs a forum in which they can obtain an administrative determination as to whether (1) the process described in the Finkel memorandum existed before the memorandum was circulated within FDA so that it was merely descriptive of existing practices; (2) the Finkel memorandum is a general statement of policy rather than a rule subject to notice and comment; (3) the plaintiffs are entitled to a stay of any approval of pending applications being processed in the manner reflected in the Finkel memorandum; and (4) the Act permits approval of post–1962 new drug applications unless supported by fresh clinical information and available "raw data." Furthermore, such an administrative proceeding could produce a decision which would be, if unsatisfactory to plain-

tiffs, susceptible to the kind of judicial review appropriate to the form of the FDA decision or rule which emerges from the process. Plaintiffs should have invoked that procedure before coming to court.

In reaching this conclusion, the Court has considered the decisions in which other Courts have proceeded *de novo* to require an agency to subject a *de facto* rule to notice and comment. *See, e. g., PMA v. Finch,* 307 F.Supp. 858 (D.Del.1970); *Pickus v. United States Board of Parole,* 165 U.S. App.D.C. 284, 507 F.2d 1107 (D.C. Cir. 1974); *National Motor Freight Traffic Ass'n v. United States,* 268 F.Supp. 90 (D.D.C.1967) (McGowan, J., for a three-judge court); *Hou Ching Chou v. Attorney General,* 362 F.Supp. 1288 (D.D.C.1973). The effect of those precedents is diluted here by the particular facts of this case. Plaintiffs are not applicants who would be frustrated from marketing their products by restrictive rules. *Compare e. g., PMA v. Finch, supra.* Moreover, the Finkel memorandum more nearly resembles a general policy than the rules at issue in other cases.[6] It is not by its terms determinative of any particular application. It appears to retain to FDA broad discretion to approve or to reject any particular application unsupported by "raw data." Thus, the Commissioner may well conclude that the Finkel memorandum forecloses neither an applicant nor its opponent from invoking FDA procedures to protest a decision on a particular new drug application or to obtain judicial review of it.

The Court recognizes that vigorous arguments of FDA lawyers here could presage a decision by FDA that neither the Finkel memorandum nor any variation of it should be issued as a rule subject to notice and comment. On the other hand, the record here reflects some consideration within the FDA staff about the advisability and, indeed, legal necessity of notice and comment with respect to the essence of the Finkel memorandum. But this consideration never culminated in any focused decision by the FDA Commissioner as to whether the mat-

---

6. *See Guardian Federal Savings & Loan Ass'n v. Federal Savings & Loan Insurance Corp.,* *supra,* 191 U.S.App.D.C. at 146, 589 F.2d at 669.

ter should be submitted to the rule-making process. As the late Judge Leventhal recently observed in a related context, the "argument of counsel . . . cannot take the place of reasoned decision-making by the official or agency concerned." *National Organization for Reform of Marijuana v. Ingersoll*, 162 U.S.App.D.C. 67, 74, 497 F.2d 654, 661 (D.C. Cir. 1974) and cases cited in note 16. *See also Shuck v. Butz*, 163 U.S.App.D.C. 142, 144, 500 F.2d 810, 812 (D.C. Cir. 1974).

Congress has provided a remedy for rejected applicants; it is in the Court of Appeals. Congress has also furnished a different, albeit less formidable, remedy appropriate for bystanders, such as plaintiffs, claiming to be injured by or threatened with unwelcome competition in the marketplace on account of a failure or refusal of the Commissioner to conduct a rulemaking proceeding or of a decision to approve a competitor's application. That remedy is by petition to the Commissioner and possible judicial review of his decision or his failure to make one.[7] Therefore, the Court concludes that defendants' motion for summary judgment on the rulemaking issue should be granted because plaintiffs have failed to invoke and exhaust the plain, effective and judicially-reviewable administrative remedy available to them at FDA.

Since defendants prevail on the merits, there is no occasion to give further consideration to plaintiffs' motion for preliminary injunction and it will be denied. Even if the Court had retained jurisdiction of the complaint, plaintiffs would not be entitled to a preliminary injunction because it is not probable that they would ultimately prevail on the merits. Moreover, they have not made sufficient showing that they have suffered or are threatened with any material irreparable injury (other than speculative marketplace "risks" of competition) during the limited time required for them to petition FDA and for FDA to act finally on that petition.