The UPJOHN MANUFACTURING COMPANY and The Upjohn Company, Plaintiffs,

v.

Richard S. SCHWEIKER, Secretary of Health & Human Services, and Arthur Hull Hayes, Jr., M.D., Commissioner of Food & Drugs, Defendants.

No. K81–114 CA4.

United States District Court,
W. D. Michigan, S. D.

July 2, 1981.

Thomas G. Parachini, James G. Vantine, Jr., Kalamazoo, Mich., Stanley L. Temko, Herbert Dym, Terry Coleman, Washington, D. C., for plaintiffs.

Robert C. Greene, U. S. Atty., Grand Rapids, Mich., J. Patrick Glynn, Gerald C. Kell, Eileen Kaufman, Consumer Affairs Section, Antitrust Div., U. S. Dept. of Justice, Washington, D. C., Jeffrey B. Springer, Forrest T. Patterson, Jeffrey N. Gibbs, FDA, Rockville, Md., for defendants.

Norman Bristol, Kalamazoo, Mich., James M. Johnstone, Tom Kirby, III, Philip H. Hecht, Washington, D. C., amicus curiae.

## OPINION

BENJAMIN F. GIBSON, District Judge.

This case involves the licensing of drug manufacturers to produce and market drugs. Plaintiffs in this action challenge the Food and Drug Administration's (FDA's) approval of a New Drug Application (NDA) by Boots Pharmaceuticals, Inc. (Boots) to manufacture and distribute a drug called ibuprofen using the trademark Rufen, which Upjohn markets using the trademark Motrin. Ibuprofen is a nonsteroidal anti-inflammatory prescription drug widely used for the relief of the symptoms of rheumatoid and osteo-arthritis and for the relief of mild to moderate pain.

The Boots Company, Ltd., the British parent of Boots, is the company that originally synthesized ibuprofen and obtained licenses to manufacture and distribute it in several other countries. Boots also obtained the United States patents on ibuprofen. In 1969 Upjohn obtained a non-exclusive patent license from Boots to manufacture and distribute ibuprofen in the Western Hemisphere.

Before Upjohn could begin marketing ibuprofen in the United States, however, FDA approval of an NDA was required. Because Upjohn's NDA was the first one submitted for ibuprofen it was what is known as the "pioneer NDA" for that drug. When another company submits an NDA for the same drug, for the same indications, that NDA is referred to as a "duplicate NDA." Regardless of whether an NDA is pioneer or duplicate, however, the same statutory and regulatory standards for approval, discussed below, apply.

Upjohn performed clinical and other testing of the drug in order to support and document its NDA so that it would meet statutory and regulatory standards. For drugs that are new since 1962, including ibuprofen, an NDA must prove that the drug is both safe and effective. The Food Drug and Cosmetic Act requires that an NDA contain "full reports" of clinical inves-

tigations made to show the safety and efficacy of a drug, as do FDA regulations. 21 U.S.C. § 355(d); 21 C.F.R. § 314.1(c)(12). Pursuant to FDA regulations, an NDA "may be refused" if it does not contain scientific investigations "on the basis of which it could fairly and responsibly be concluded ... that the drug will have the effect it purports or is represented to have," 21 C.F.R. § 314.1(c)(12)(b). These regulations provide further that the reports of these investigations, among other things, "should include adequate information concerning each subject treated with the drug .... [and] results of all relevant clinical observations and laboratory examinations made," 21 C.F.R. § 314.1(c)(12)(c).

The "full reports of clinical investigations" requirement includes submission of "[a]ll information pertinent to an evaluation of the safety and effectiveness of the drug received ... from any source, including information derived from other investigations or commercial marketing ... or reports in the scientific literature." 21 C.F.R. § 314.1(c)(12)(e). The FDA's policy of relying on published scientific reports, at least in part, in determining a drug to be safe and effective, has been the subject of recent litigation by Upjohn and others. *American Critical Care v. Schweiker*, No. 81–C–252 (N.D.Ill.1981); *Boots Pharmaceuticals Inc. v. Schweiker*, C.A. No. CI 810203 (W.D.La.1981); *Burroughs Wellcome Co. v. Schweiker*, 80–888–Civ.–5 (E.D.N.C.) aff'd, 649 F.2d 221 (4th Cir. 1981); *Hoffman La-Roche, Inc. v. Harris*, 484 F.Supp. 58 (D.D.C. 1979). Each of the various challenges to this policy, which has come to be known as the "paper NDA"[1] policy, has been rejected, and the policy's validity upheld. *Id.* The case before this Court assumes the validity of the paper NDA policy generally

but challenges the approval of a particular NDA, the Boots NDA for ibuprofen, pursuant to the policy. Specifically, Upjohn claims that the findings in the FDA's summary basis of approval of the Boots NDA are insufficient to support the approval pursuant to the rationales offered by the FDA in support of the paper NDA policy. The argument is essentially factual—that the published scientific reports cited by the FDA are insufficient to provide a basis for approval of an NDA, even under the paper NDA policy.[2] Upjohn then asserts that the FDA must, therefore, have consciously or unconsciously based the approval on the knowledge of ibuprofen's safety and efficacy that the FDA has only through trade secret data in the Upjohn NDA for Motrin. Upjohn raised these issues with FDA by means of a citizen's petition asking that the Boots NDA be rejected. The citizen's petition was denied by FDA. Upjohn now seeks a declaratory judgment that the FDA's approval of the Boots NDA for ibuprofen was unlawful and that the denial of its citizen petition also was unlawful. This opinion addresses Upjohn's motion for a stay of the effect of the FDA's approval by postponing the effective date, and the FDA's motion to dismiss or for summary judgment.

Before the Court can address the merits of Upjohn's claims, however, the issues of standing and exhaustion of administrative remedies must be decided. The FDA and *amicus* Boots have presented these issues as grounds for denying Upjohn's claim without reaching its merits.

■ Upjohn bases its standing on the possible detrimental impact of the FDA's action on its competitive market position, and on its claim that pursuant to 21 C.F.R.

---

1. An NDA for a duplicate drug that relies solely or primarily on published reports to establish safety and efficacy has come to be known by FDA and those in the drug industry generally as a "paper NDA." *E.g., Burroughs Wellcome Co. v. Harris*, No. 80–888–Civ.–5 (E.D.N.C.) aff'd, 649 F.2d 221 (4th Cir. 1981).

2. Upjohn in no way asserts that ibuprofen is not safe and effective, only that the Boots NDA

does not sufficiently show FDA that it is. FDA, in approving Upjohn's pioneer NDAs for ibuprofen has found it to be safe and effective based on the data submitted by Upjohn. Much of that data, however, is trade secret material unavailable to either Boots or FDA for the purposes of evaluating Boots' duplicate NDA. *See* 21 C.F.R. § 314.1(b); 21 C.F.R. § 314.14(f)(5).

§ 314.14(f)(5) [3] trade secret data and information contained in its Motrin NDA is made subject to public disclosure because of the FDA's approval of the Boots NDA.[4] Whatever the merit of these claims, the Court is of the opinion that they meet the necessary requirements for standing.

█ █ The basis of Upjohn's citizen petition was the same as that presented here— that the published studies and information other than Upjohn's trade secret data are inadequate to support approval of the Boots NDA. The argument was presented to the FDA and rejected. The rejection of the Upjohn citizen petition and the approval of the Boots NDA constitute final agency action reviewable by this Court under 5 U.S.C. §§ 702 & 704. The FDA would have the Court require Upjohn to seek withdrawal of the Boots NDA under 21 U.S.C. § 355(e) before obtaining judicial review. The standards for withdrawal, however, are different than for initial approval. In order to successfully have the NDA withdrawn, Upjohn would have to show that ibuprofen was either not safe or not effective. This is not Upjohn's position, so requiring it to pursue this avenue would be fruitless. In light of these facts, the Court will not dismiss this action for lack of proper exhaustion of administrative remedies.

█ █ The scope of this Court's review is limited to a determination of whether the challenged FDA actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The FDA's interpretation and construction of the relevant statutes and regulations, furthermore, is entitled to substantial deference in light of its expertise and experience. *United States v. Rutherford*, 442 U.S. 544, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979).

Upjohn's theory challenges the FDA's action as contrary to its announced justifications for the paper NDA policy, and also attempts to show that the FDA's summary basis of approval for the Boots NDA does not cite sufficient studies to support approval. The FDA published a detailed rationale for its adoption of the paper NDA policy titled "Response to Petition Seeking Withdrawal of the Policy Described in the Agency's 'Paper' NDA Memorandum of July 31, 1978." 45 Fed.Reg. 82052 (1980). The stated reasons for the policy include:

> When it is well established in the literature that a drug is safe and effective for a particular use, the agency believes that there is no valid scientific reason to require more tests in animals and humans to show that the same drug is safe and effective for the same use. Such tests are ethically questionable because they may expose human subjects to risk without medical justification, and they are wasteful of limited resources.

45 Fed.Reg. 82052.

> This policy reflects the agency's recognition of the reliability of a group of independently published reports of adequate and well-controlled studies, all of which reach consistent conclusions about the safety and effectiveness of a drug. (See Finkel statement, paragraph 17.) The reports are often subject to peer review prior to publication, and all published reports are potentially subject to widespread critical review after publication. Other researchers may initiate studies to confirm reported findings. Through this process, which rarely involves the scrutiny of raw data by a researcher's peers,

---

**3.** (f) all safety and effectiveness data and information not previously disclosed to the public are available for public disclosure at the time any one of the following events occurs unless extraordinary circumstances are shown:
(5) A final determination has been made that the drug may be marketed without submission of such safety and/or effectiveness data and information.
  21 C.F.R. § 314.14(f)(5).

**4.** The FDA does not interpret its regulation the way Upjohn does, and argues that the data in Upjohn's Motrin NDA is not made subject to disclosure by its approval of the Boots NDA. *See Defendant's Exhibit 10.* The agency's interpretation of its own regulation is entitled to substantial deference from the Court. *United States v. Rutherford*, 442 U.S. 544, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979).

reported scientific observations are challenged, retested, and confirmed or rejected. Thus, the verification of published reports of research is not accomplished through the examination of raw data but rather through public exposure of the results of retesting by others engaged in similar research.

45 Fed.Reg. 82054.

█ The primary raison d'etre of the FDA is the protection of the public health and safety, rather than the protection of the competitive position of a pioneer NDA holder. The usual requirement of submission of raw clinical data in an NDA not based on literature allows the FDA to protect against fraud and conscious or unconscious bias. The FDA's position supporting the paper NDA policy is that the likelihood of fraud or bias existing after years of published studies subject to verification through the scrutiny of the publishing journals and the general scientific community, the potential for testing and duplication, and the experience of the drug's performance once it is on the market, becomes vastly diminished. In such a situation verification is accomplished through scrutiny by the scientific community without the necessity for the FDA closely examining the underlying raw data. As previously noted, the courts have unanimously upheld the validity of the paper NDA policy. *American Critical Care v. Schweiker*, No. 81–C–252 (N.D.Ill.1981); *Boots Pharmaceuticals, Inc. v. Schweiker*, C.A. No. CI 810203 (W.D. La.1981); *Burroughs Wellcome Co. v. Schweiker*, 80–888–Civ.–5 (E.D.N.C.), aff'd, 649 F.2d 221 (4th Cir. 1981); *Hoffman LaRoche, Inc. v. Harris*, 484 F.Supp. 58 (D.D.C. 1979).

█ Claiming that the rationale of the paper NDA policy requires reliance on studies by independent *researchers* and duplicated studies, Upjohn argues that published accounts of studies done or sponsored by Upjohn can not be used by Boots to support its NDA, and attempts to discredit many other studies cited by the FDA in the summary basis of approval on the basis that the studies have not been duplicated. The FDA

responds, and the Court agrees, that the paper NDA policy finds its support in relying on independently *published* studies, and that actual duplication of studies is not necessary where different studies and the experience gained through years of product use in the market indicate safety and effectiveness without contradiction. Upjohn next attempts to focus the Court's attention on alleged deficiencies in each study one at a time. The law, however, does not require any single study, viewed in isolation, to provide total support for the FDA's action. Rather, the record must be viewed as a whole, taking into account the cumulative and reinforcing nature of the evidence. *Cf. Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *Miracle v. Celebrezze*, 351 F.2d 361 (6th Cir. 1965).

█ The FDA has found the Rufen brand of ibuprofen is safe and effective for relief of the symptoms of rheumatoid and osteoarthritis and for the relief of mild to moderate pain based on the information supplied to it by Boots. There is no indication, other than Upjohn's unsupported assertion, that the FDA improperly and unlawfully relied on trade secret information in Upjohn's NDA. In fact the FDA expressly denies that it did so, and its summary basis of approval justifies its decision without reference to information outside the Boots NDA. The law is firmly established that administrative decisions are to be taken at face value without attempting to examine the mental processes of the decisionmaker. *E. g., United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941). In *Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Court reaffirmed this rule, holding that a reviewing court may only examine behind an administrative decisionmaker's stated reasons for a decision upon a "strong showing of bad faith or improper behavior," *Id.* at 420, 61 S.Ct. at 1003–04, accord, *National Nutritional Foods Ass'n v. F.D.A.*, 491 F.2d 1141 (2nd Cir.), cert. denied, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974). Upjohn

has made no such showing and this Court, therefore, will not probe the mental processes of this decision.

After a careful review of the pleadings, exhibits and arguments in this case, and consideration of the same in light of the standards discussed above, it is this Court's decision that the defendant is entitled to judgment as a matter of law. Defendant's motion for summary judgment, therefore, is granted. Today's decision obviates the need for discussion of Upjohn's motion for stay, and the same is hereby denied.

IT IS SO ORDERED.