FAMILY & CHILDREN'S CENTER, INC., Plaintiff–Appellant,

v.

SCHOOL CITY OF MISHAWAKA, Defendant–Appellee.

No. 93–1843.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 27, 1993.

Decided Jan. 5, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied March 15, 1994.

James M. Lewis (argued), Douglas D. Small, Barnes & Thornburg, South Bend, IN, for plaintiff-appellant.

John B. Drummy, Donald L. Dawson, Thomas E. Wheeler (argued), Kightlinger & Gray, Indianapolis, IN, for defendant-appellee.

Before CUMMINGS and FLAUM, Circuit Judges, and WILL, District Judge.*

FLAUM, Circuit Judge.

This case presents the narrow issue of whether Family & Children's Center, Inc. ("FCC"), an Indiana non-profit corporation which operates a licensed, private child care facility, should be accorded third-party

* The Honorable Hubert L. Will, of the Northern District of Illinois, sitting by designation.

standing to advocate the rights of children with disabilities [1] who have been placed in its physical but not legal custody by court order or as a result of action by state or local child welfare departments. FCC seeks an order declaring that the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–85 (1990 & Supp.1993), obligates School City of Mishawaka ("School City"): (1) to provide classrooms and related facilities for the education of the children with disabilities, and (2) to educate the children with disabilities placed with FCC who are periodically and temporarily cared for at two group homes owned by FCC and located in the City of South Bend. Following oral argument, the district court granted School City's motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure on the ground that FCC lacks standing to assert claims under the IDEA. We reverse.

## I.

FCC is an Indiana non-profit corporation which operates a licensed, private child care facility. FCC's main campus and offices are located in Mishawaka, Indiana. In addition, FCC owns and operates three group homes, one in Mishawaka and two in South Bend. Between the main campus and the group homes, FCC cares for approximately 110 emotionally handicapped children at any given time. FCC has actual physical custody of the children as the result of either court order or action by state or local welfare departments, but FCC is neither legal guard-

ian, parent, or surrogate parent to any of these children. Legal custody of these children, in fact, remains either with the courts, the placing agencies,[2] or the parents under the laws of Indiana. School City is a consolidated school corporation operating pursuant to the laws of the State of Indiana. School City is primarily responsible for educating students from the City of Mishawaka.

Until 1979, children with disabilities in the Mishawaka area attended the Mishawaka public schools. In that year, responding to the large number of children with disabilities who had been suspended or expelled from school because of behavior related to their handicaps, FCC began its own school and started educating the children at its own expense. In 1982, FCC and School City entered into an Instructional Services Agreement (the "Agreement") by which School City agreed to provide FCC with 95% of transfer tuition monies received from the children's home counties and FCC agreed to continue its educational program for the children. The Agreement proved satisfactory for a number of years, but, by 1989, an increase in the number of children placed with FCC and the degree of emotional impairment suffered by many of the children caused FCC to seek a new arrangement.

Despite years of negotiation, FCC and School City have been unable to reach a new accord satisfactory to both parties. FCC insists that School City is shirking its statutory duty to provide a "free appropriate public education to children with disabilities."

---

1. Although the phrase "handicapped children" was used in the statute at the commencement of this litigation and has been used by the parties throughout, Congress, in the interim, has amended the IDEA to refer to "children with disabilities." Pub.L. 101–476, 104 Stat. 1145, Oct. 30, 1990. This opinion will use the phrase "children with disabilities" or simply the word "children" where appropriate.

2. According to the administrative record, the following agencies placed children at FCC during the period considered by the Indiana Department of Education (IDOE) in its investigation of the issues raised in FCC's complaint:

| | |
|---|---|
| Indiana Department of Public Welfare (DPW) | 133 |
| Various County Probation Departments (P) | 69 |
| S–5 Residential Placements (S–5) | 5 |
| Cook County (Illinois) DCFS (DCFS) | 4 |
| Kane County (Illinois) Juvenile Court (KCJ) | 1 |
| Indiana Department of Education (DOE) | 1 |
| Arizona Adoption Subsidy (AAS) | 1 |
| VAN | 1 |
| Unknown (UKN) | 1 |
| | 216 |

Of these 216 children, 104 were referred by FCC to School City for special educational services. 101 of these 104 had "surrogate parents" appointed for them pursuant to 511 IAC 7–9–1 and in compliance with 20 U.S.C. § 1415(b)(1)(B). The remaining three children did not require "surrogate parents" because their parents were available.

In particular, FCC and School City have locked horns over two issues: facilities and the group homes. School City contends that it has no obligation to provide classrooms and related facilities for the education of children on FCC's campus. According to School City, FCC must provide the facility at its own cost while School City would provide the staff and educational program. In other words, School City refuses to pay rent and related expenses associated with School City's use of FCC's facilities. School City also has taken the position that it has no obligation to educate the children placed with FCC who are periodically and temporarily treated at one of the South Bend group homes. FCC submits that the group home environment is an important facet of its overall treatment program. Prior to School City's refusal to educate children at the group homes, FCC frequently transferred children between the main campus and the group homes. Recently, however, FCC has chosen not to place many children in the group homes, despite the fact that their situation otherwise would call for such treatment, because of the anxiety and hardship associated with transferring to a different school system with different teachers and curriculum.

 FCC then turned to the administrative and judicial procedures available under the IDEA, 20 U.S.C. § 1400 *et seq.* The IDEA was enacted:

> to assure that all children with disabilities have available to them ... a free appropriate public education that emphasizes special education and related services designed to meet their unique needs, to assure that the rights of children with disabilities and their parents or guardians are protected, to assist States and localities to provide for the education of all children with disabilities, and to assess and assure the effectiveness of efforts to educate children with disabilities.

20 U.S.C. § 1400(c). The IDEA conditions federal assistance upon a state's compliance with the substantive and procedural goals of the Act. *See Hendrick Hudson Central Dist. Bd. of Educ. v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Section 1415(b) of the IDEA requires states to provide an impartial administrative process that assures compliance with the federal mandate of a "free appropriate public education" by the relevant state agencies. Indiana's procedural safeguards are codified at 511 IAC 7-1-7. According to the IDEA, the required process "shall include, but shall not be limited to" an opportunity for parents, guardians, or surrogates to examine records and file complaints with state or local education authorities. 20 U.S.C. § 1415(b). As the district court noted, the scope of Indiana's regulatory scheme extends beyond the minimum required by § 1415 in that it permits "[a]ny individual, group of individuals, agency, or organization" to file a complaint alleging violation of federal or state laws that apply to special education. 511 IAC 7-15-4. Finally, the IDEA provides a right of action in federal district court, 20 U.S.C. § 1415(e), but only after a prospective plaintiff has exhausted state administrative remedies. *See Doe By and Through Doe v. Smith,* 879 F.2d 1340 (6th Cir.1989), *cert. denied,* 493 U.S. 1025, 110 S.Ct. 730, 107 L.Ed.2d 749 (1990).

On September 17, 1991, FCC filed a complaint with the Indiana State Department of Education (the "Department") pursuant to 511 IAC 7-15-4. FCC asked the Department to direct School City to (1) provide facilities, teachers, and staff for the education of the children, (2) educate the children who are housed from time to time in the group homes, (3) pay FCC for the fair rental value of FCC's facilities used to educate the children, (4) reimburse FCC for its expenses in educating the children, and (5) provide year-round education for those children who require it.

The Department addressed FCC's petition in a two-part manner. First, the Department referred the matter to its Division of Special Education (the "Division") for an investigation into whether School City had violated Indiana education regulations. On December 9, 1991, the Division entered its findings of fact, conclusions of law, and an order deciding against FCC. FCC filed a Request for Reconsideration which the Division denied on January 14, 1992. FCC then appealed the Division's findings, under 511 IAC 7-

15–4(j), to the United States Department of Education which declined to hear the appeal on July 22, 1992.

Second, the Department, over the objection of FCC, determined that the question of whether School City is obligated to provide classrooms and related facilities for the children should be resolved as a transfer tuition matter rather than as a special education matter. As a result of this determination, on May 15, 1992, the Department dismissed the part of FCC's petition dealing with facilities because transfer tuition only can be received by a school corporation and FCC was not a school corporation.

Having exhausted its state remedies, FCC filed suit in the United States District Court for the Northern District of Indiana, South Bend Division on May 29, 1992. In its original complaint, FCC asserted four claims under IDEA and three claims under Indiana law. On December 4, 1992, School City filed a motion to dismiss FCC's claims under IDEA for lack of standing. School City also requested that the district court decline to exercise supplemental jurisdiction over FCC's state law claims. On February 16, 1993, FCC moved for leave to amend its complaint and to dismiss without prejudice its state law claims. The district court granted FCC's motion on February 24, 1993. In its amended complaint, FCC narrowed its claim to a request for an order declaring that School City is obligated to: (1) provide classrooms and related facilities in educating the children with disabilities, and (2) educate the children with disabilities placed with FCC who are periodically and temporarily cared for at the South Bend group homes.

Following oral argument, on March 19, 1993, the district court granted School City's motion to dismiss for lack of standing. Evidently drawing upon the language of § 1415(b), the court framed the standing inquiry as "whether FCC can, under IDEA, become surrogate parents or guardians of these handicapped children to bring complaints and seek remedies on their behalf." Mem.Op. at 15. In other words, the court agreed with School City that only parents, guardians, and surrogate parents have standing to raise the administrative and judicial procedures enumerated in IDEA. The court concluded that FCC clearly is not a parent or guardian of the children. *Id.* at 17. Moreover, because the term *surrogate* has a particularized meaning in the context of IDEA, the court opined that FCC lacks standing on that basis as well. *Id.* at 19. Finally, the court rejected FCC's third-party standing argument because "FCC is not asserting that it wishes to represent the rights of the designated parents of the handicapped children in its facility; it wishes to stand in the place of the parents." *Id.* at 20–21.

Briefly stated, the parties' positions are as follows: FCC argues that it should be accorded third-party standing to assert the children's rights under IDEA because "those parties that Congress explicitly accorded standing to—parents, guardians, and surrogate parents—are [ ] not in a position" to do so. FCC maintains that the statutory purpose of safeguarding the children's right to a free appropriate public education would be frustrated if it is barred from federal court in this case. FCC also contends that both the constitutional and prudential requirements for third-party standing are satisfied in this case.

School City responds that the express language of the statute permits only three categories of individuals to raise the children's rights under IDEA. Furthermore, the statutory language, implementing regulations, and legislative history give no affirmative indication that Congress intended to grant standing to any additional parties. Most notably, School City directs us to legislative history demonstrating that Congress expressly considered and rejected a provision requiring states to allow any individual to complain to the state educational agency on behalf of the children. In sum, School City asks us to affirm the district court's judgment because Congress did not intend for parties such as FCC to have a private cause of action under the IDEA.

II.

We review the grant of a motion to dismiss a complaint for lack of subject matter jurisdiction *de novo*. *Underwood v. Venango*

*River Corp.,* 995 F.2d 677, 679 (7th Cir.1993). The only issue presented here, whether FCC has standing to assert claims under the IDEA, is a threshold matter because putative plaintiffs lacking standing are not entitled to have their claims litigated in federal courts. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *Freedom From Religion Foundation, Inc. v. Zielke,* 845 F.2d 1463, 1467 (7th Cir.1988). An analysis of a litigant's standing focuses not on the claim itself, but on the party who is bringing the challenge.[3] *Zielke,* 845 F.2d at 1467. The Supreme Court has directed us to resolve questions of standing according to a two-part inquiry that considers "both constitutional limitations of federal-court jurisdiction and prudential limitations in its exercise." *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979) (quoting *Warth,* 422 U.S. at 498, 95 S.Ct. at 2205 (1975)). In both dimensions—Article III and prudential—the test for standing "is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Id.* Ordinarily, "a litigant seeking relief in federal court must satisfy *both* constitutional and prudential limitations in order to have standing to sue." *Locals 666 and 780 v. United States Dept. of Labor,* 760 F.2d 141, 143 (7th Cir.) (emphasis in original), *cert. denied,* 474 U.S. 901, 106 S.Ct. 227, 88 L.Ed.2d 227 (1985).

### A.

▇▇▇▇ Under Article III, the federal judicial power extends only to "cases" or "controversies." The constitutional limitation on standing eliminates cases in which a plaintiff can demonstrate no "case or controversy" between himself and the defendant. *Crosetto v. State Bar of Wisconsin,* 12 F.3d 1396 at 1403 (7th Cir.1993); *Gorski v. Troy,* 929 F.2d 1183, 1186 (7th Cir.1991). To satisfy Article III, a plaintiff must allege: (1) an immediate threat of injury; (2) fairly traceable to the defendant's conduct; that (3) a favorable fed-

eral court decision likely would redress or remedy. *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471–472, 102 S.Ct. 752, 757–58, 70 L.Ed.2d 700 (1982); *Harris v. City of Zion,* 927 F.2d 1401, 1405 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3025, 120 L.Ed.2d 897 (1992) (citations omitted). The party invoking federal jurisdiction has the burden of establishing these elements, but at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice. *Lujan,* —— U.S. at —— – ——, 112 S.Ct. at 2136–2137.

▇▇▇▇ As this court has noted, the Article III standing requirements are rather "undemanding." *North Shore Gas Co. v. E.P.A.,* 930 F.2d 1239, 1242 (7th Cir.1991). The first prong probes for an "actual or imminent" injury that is "concrete and particularized" to the party asserting the claim. *Lujan,* —— U.S. at ——, 112 S.Ct. at 2136. In other words, the plaintiff must have an actual stake in the outcome that goes beyond "intellectual or academic curiosity." *South East Lake View,* 685 F.2d at 1033. Provided the plaintiff has thus established his or her *bona fides,* even a minor or non-economic injury will satisfy the strictures of Article III, though purely psychological harm will not. *Zielke,* 845 F.2d at 1467. In addition, the plaintiff need not show absolutely that a favorable judgment would redress his injury; a "probabilistic benefit from winning a suit" is adequate. *North Shore Gas,* 930 F.2d at 1242.

▇▇▇▇ School City does not appear to challenge FCC's contention that FCC meets the Article III standing requirements. Nevertheless, because standing is a jurisdictional matter, we consider the sufficiency of FCC's allegations. *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541, 106 S.Ct.

---

**3.** Questions of standing deal exclusively with whether the plaintiff alleged facts satisfying the constitutional and prudential limitations of the standing doctrine. Whether the complaint on its merits could survive a summary judgment mo-

tion or support a judgment after a full trial is not relevant at this early stage. *South East Lake View, Etc. v. Dept. of Housing,* 685 F.2d 1027, 1034 (7th Cir.1982).

1326, 1331, 89 L.Ed.2d 501 (1986). FCC contends that School City's refusal to pay rent or expenses associated with the education of the children with disabilities, both at FCC's campus and in the group homes, constitutes an injury to it directly traceable to School City's conduct. According to FCC, School City has an obligation under the IDEA either to reimburse FCC for the cost of educating the children or to educate the children themselves. Because School City has done neither, FCC has been deprived of the rental value of its facilities while absorbing the costs of wear and tear on the premises. FCC further submits that a court order requiring School City to comply with IDEA's mandate that the children receive a "free and appropriate public education" by providing classrooms and other facilities and financially supporting the group home concept would redress FCC's injury.

 Accepting as true all facts alleged in the well-pleaded complaint and drawing all reasonable inferences in favor of the plaintiff, as we must, *Sherman v. Four County Counseling Center*, 987 F.2d 397, 399 (7th Cir. 1993), we agree that FCC fulfills the Article III standing requirements. Briefly put, FCC argues that School City's denial of the children's rights under IDEA has deprived it of money to which it otherwise would have been entitled. In this respect, FCC's claim parallels that of the plaintiffs seeking third-party standing in *Amato v. Wilentz*, 952 F.2d 742 (3d Cir.1991). In that case Essex County, New Jersey, sued New Jersey Supreme Court Chief Justice Robert Wilentz because the latter refused to permit Warner Brothers to film a scene for the movie "Bonfire of the Vanities" in the County Courthouse. The County alleged that Chief Justice Wilentz violated Warner Brothers' First Amendment rights and caused the County to lose $250,-000 in revenue. The district court entered judgment for the County, *Amato v. Wilentz*, 753 F.Supp. 543 (D.N.J.1990). On appeal, the Third Circuit found that the County had satisfied the Article III standing requirements on the basis of the following "pithy" argument by plaintiff's counsel:

If Warner Brothers had not been deprived of its First Amendment right to make this picture or scenes therefrom in the Old Essex County Courthouse, the county treasury would have been enriched by something in excess of a quarter of a million dollars. That is our standing. We want the money.

952 F.2d 742, 747 n. 5 (3d Cir.1991).[4] In a similar vein, FCC argues that if the children had not been deprived of their rights under IDEA, FCC would have been enriched either through rent payments from School City or by virtue of reduced wear and tear on its facilities. As summarized here, FCC's allegations demonstrate "distinct and palpable" harm, *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206, fairly traceable to School City's conduct that a favorable ruling on the merits likely would redress. We therefore conclude that FCC meets Article III minima for standing.

### B.

 Even if a party satisfies the Article III criteria, there are several judicially self-imposed limits on the exercise of federal jurisdiction that may preclude a litigant's standing, including:

the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.

*Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). These prudential limitations on standing eliminate cases "where no individual rights would be vindicated" and restrict "access to federal courts to those litigants best suited to assert a particular claim." *Gladstone*, 441 U.S. at 100, 99 S.Ct. at 1608; *Gorski*, 929 F.2d at 1186. Unlike the Article III barriers to suit, however, Congress may override the prudential limits on standing by statute. *Gladstone*, 441 U.S. at 100, 99 S.Ct. at 1608; *Warth*, 422 U.S. at 500–501, 95 S.Ct. at 2206; *North Shore Gas*, 930 F.2d at 1244; *Center for Auto*

4. The Third Circuit nevertheless vacated that judgment on the ground that the County did not satisfy the prudential rules for third-party standing.

*Safety v. N.H.T.S.A.*, 793 F.2d 1322, 1335 (D.C.Cir.1986); Paul M. Bator, et al., Hart and Wechsler's The Federal Courts and the Federal System 135 (3d ed. 1988). As the Court explained in *Warth,*

> [T]he source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing that, apart from Art. III's minimum requirements, serve to limit the role of the courts in resolving public disputes. Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief. In some circumstances, countervailing considerations may outweigh the concerns underlying the usual reluctance to exert judicial power when the plaintiff's claim to relief rests on the legal rights of third parties. . . . [S]o long as [Article III] is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others. . . .

*Warth,* 422 U.S. at 500–501, 95 S.Ct. at 2206; *see also North Shore Gas,* 930 F.2d at 1244 ("Congress can if it wants allow someone injured in fact by the violation of a statute to bring suit to redress the violation . . . even if he wasn't an intended beneficiary of the statute in the usual sense. . . ."). In fact, Congress frequently has exercised this prerogative, most often in statutes that involve civil rights, consumer issues, or environmental interests. *See Center for Auto Safety,* 793 F.2d at 1336. Where a statute grants standing to the full limits of Article III, courts "lack authority to create prudential barriers to standing" in suits brought under that statute. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982) (holding that Congress intended standing under § 812 of the Fair Housing Act of 1968 and therefore the sole requirements for standing to sue under § 812 are the Article III minima).

■ We now examine the IDEA to determine whether the statutory language grants a cause of action to FCC to seek relief on the basis of the children's rights and interests. This court repeatedly has held that, in cases of statutory interpretation, "[o]ur starting point must be the language of the statute." *Gorski,* 929 F.2d at 1187 n. 5 (citing *Bethlehem Steel Corp. v. Bush,* 918 F.2d 1323, 1326 (7th Cir.1990)). If the statute is unambiguous, we must enforce the plain meaning of the language enacted by Congress.

■ As explained above, *supra* at 5, § 1415 of the IDEA conditions federal assistance upon a state's compliance with the substantive and procedural goals of the Act. *See Andrews v. Ledbetter,* 880 F.2d 1287, 1288 (11th Cir.1989). Section 1415(b) sets out a number of required procedures, including an opportunity for parents, guardians, or surrogates to examine records and file complaints with state or local education authorities. Significantly, the statutory language expressly states that "the procedures required by this section *shall include, but shall not be limited to* " the mandatory ones summarized above. 20 U.S.C. § 1415(b)(1) (emphasis supplied). Thus, Congress created a procedural minimum below which a state cannot fall if it wishes to retain eligibility for federal assistance. In so doing, Congress gave no indication of forbidding a state from providing greater protection for the rights of the children. By enacting 511 IAC 7–15–4, which permits "any individual, group of individuals, agency, or organization" to file a complaint alleging the violation of federal laws that apply to special education, like the IDEA, the Indiana legislature has complied fully with the dictates of § 1415(b). In other words, the Indiana legislature has invited FCC to initiate the state administrative process required by § 1415(b) as a condition of federal assistance for the education of Indiana's children with disabilities. And the IDEA clearly authorized Indiana to do so.

■ The record shows that FCC exhausted its state remedies as an aggrieved party is required to do by subsection (b) before filing suit.[5] Thus, FCC was entitled

---

5. Because the hearing required by § 1415(b) was conducted by the State Department of Education (rather than a local or intermediate educational agency) we believe that § 1415(c) was inapplica-

to proceed under paragraph (2) of § 1415(e). *See* 20 U.S.C. § 1415(e). Paragraph (2) states in relevant part:

> Any party aggrieved by the findings and decision made under subsection (b) of this section who does not have the right to an appeal under subsection (c) of this section, and any party aggrieved by the findings and decision under subsection (c) of this section, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction *or in a district court of the United States without regard to the amount in controversy.*

20 U.S.C. § 1415(e)(2) (emphasis supplied). Again reading the plain language of the statute, it is evident that FCC qualifies as a "party aggrieved by the findings and decision made under subsection (b) of [§ 1415]" by virtue of the enhanced scope of Indiana's process for reviewing complaints about special education programs. Thus, viewing the statute as a whole, *Conroy v. Aniskoff,* —— U.S. ——, ——, 113 S.Ct. 1562, 1565, 123 L.Ed.2d 229 (1993), we conclude that by clear implication § 1415 grants a right of action to FCC on behalf of the children with disabilities. *See Warth,* 422 U.S. at 501, 95 S.Ct. at 2206.

By implicitly granting standing to a broad group of plaintiffs, Congress has removed the rationale for invoking our usual prudential restraints on judicial review. As the D.C. Circuit opined in *Center for Auto Safety,*

> It would make no sense to deny standing under a principle designed to prevent courts from encroaching on the legislature's domain where Congress itself has already 'weighed the need for and the value of judicial review of a given category of administrative decisions, and has decided it is warranted.'

793 F.2d at 1337. FCC, therefore, need not run the gauntlet of prudential standing tests; satisfying Article III is enough.

ble to the administrative proceedings at issue

### III.

Following the plain language of § 1415, and reading that statute as a whole, we are convinced that Congress has implicitly granted standing under the IDEA to the limits of Article III. In § 1415, Congress created a flexible scheme to protect the educational rights and interests of children with disabilities. With respect to the boundaries of third-party standing under the IDEA, § 1415 establishes the required procedures in subsection (b) as the floor and Article III as the ceiling. Within that range, Congress has deferred to the judgment of the states and localities. Indiana's procedural scheme, enacted in compliance with § 1415, broadly grants third-party standing to raise complaints alleging violations of the IDEA. Having properly invoked and exhausted available state administrative remedies, FCC then was entitled to bring this action in federal court if it could satisfy the requirements of Article III standing. FCC has standing in the Article III sense on the basis of its allegations of injury in fact, fairly traceable to School City, that a favorable decision on the merits might redress. Accordingly, we REVERSE the judgment of the district court and REMAND the case for further proceedings consistent with this opinion.

REVERSED AND REMANDED.