John and Connie **BARNES**, Steve and Karen Sponem, John Scheidegger, Dennis Jelle, Steve Rosga, Charles Remy, Scott Rosga, Marlin Wild, Gary Gruenenfelder, Tim and Wendy Hendrickson, Bryon and Pamela Krahenbuhl, Steve and Stephanie Zimmerman, Joe and Linda Zangl, Clarence and Beth Thurk, John and Betty Schmidt, Gordon and Doris Belling, Arnold and Marilyn Oechsner, Laura Berger, Michael Cannell, Francis Goodman, Peter Hardin, John Kinsman, Bruce and Shelley Krug, Jim Mieves, Odessa Piper, John Stauber, Glenn Stoddard, on his own behalf and as next friend of Patrick Stoddard, Russell Stoer, Foundation on Economic Trends, Mifflin Street Community Cooperative, North Farm Cooperative, Plaintiffs,

v.

Donna **SHALALA**, in her official capacity as Secretary of Health and Human Services; Dr. David Kessler, in his official capacity as Commissioner of the Food and Drug Administration, Defendants.

No. 94–C–90–C.

W.D. Wisconsin.

Sept. 1, 1994.

Amended Sept. 22, 1994.

Michael R. Bauer, Garvey & Bauer Legal Service, Madison, WI, for plaintiffs.

Jacqueline H. Eagle, Office of Consumer Litigation, Washington, DC, for Donna Shalala.

Leslie Kux, Assoc. Chief Counsel for Veterinary Medicine, Office of the General Counsel, Rockville, MD, for David Kessler.

## OPINION and ORDER

CRABB, Chief Judge.

This is a case about milk, a subject near and dear to the hearts of Wisconsinites. Plaintiffs are thirty Wisconsin dairy farmers; a veterinarian; a nutritional educator; a registered nurse; the editor of Milk Weed, a farm journal; a co-owner of Chula Vista Cheese Company; the owner of L'Etoile, a restaurant in Madison, Wisconsin; two consumers of dairy products; a milk bottler; the Mifflin Street Community Cooperative of Madison; the North Farm Cooperative, a natural foods distributor and wholesaler in Madison; and the Foundation for Economic Trends, a consumer rights organization. Plaintiffs bring this civil action for declarato-

ry and injunctive relief pursuant to the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301–394, the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370d, and the Administrative Procedure Act, 5 U.S.C. §§ 500–706. Defendants are Donna Shalala, Secretary of the Department of Health and Human Services, and Dr. David Kessler, Commissioner of the Food and Drug Administration.

Approval of a new drug application for animals requires a manufacturer to demonstrate that its drug is safe and effective for use and that the food products derived from animals treated with the drug are safe for human consumption. 21 U.S.C. § 360b(d)(1) and (2). Plaintiffs contend that defendants acted improperly in approving Monsanto Corporation's application for use of the drug Posilac(R) in dairy cows. (Posilac is the trade name for recombinant bovine somatotropin (rbST), also known as bovine growth hormone (BGH).) Plaintiffs challenge defendants' approval on three grounds: 1) the approval was arbitrary and capricious because the FDA failed to consider health and safety issues related to the use of rbST; 2) defendants failed to require mandatory labeling of products from cows treated with rbST; and 3) defendants failed to conduct an adequate environmental assessment or issue an environmental impact statement assessing the environmental effects of rbST approval. Plaintiffs request both a declaration under 28 U.S.C. § 2201 and Fed.R.Civ.P. 57 that defendants failed to perform their statutory duties in approving rbST and a permanent injunction suspending the approval of rbST until defendants comply with their statutory obligations.

The case is before the court at this time on defendants' motion to dismiss for lack of subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1). Defendants contend that either the Court of Appeals for the District of Columbia or the Court of Appeals for the Seventh Circuit has exclusive jurisdiction over plaintiffs' claims under the Food, Drug and Cosmetic Act; that defendants' decision not to require labeling is unreviewable, and that plaintiffs do not have standing to maintain this action under either the Food, Drug and Cosmetic Act or the National Environmental Policy Act. I conclude that this court does have jurisdiction over plaintiffs' Food, Drug and Cosmetic Act claims and that the plaintiff consumers have standing to maintain this action under that act and under the National Environmental Policy Act. Further, I conclude that because defendants' failure to label products containing milk from rbST-treated cows is a reviewable agency decision, defendants' motion to dismiss plaintiffs' labeling claim must be denied.

## OPINION

### I. JURISDICTION

■ The parties agree that the provisions of the Food, Drug and Cosmetic Act governing judicial review are §§ 355(h) and 360b. Section 355(h) relates to approval of drugs for human use; § 360b incorporates the review procedures in § 355(h) for review of new animal drug applications. By its explicit terms, § 355(h) grants the courts of appeals exclusive jurisdiction to entertain appeals from the Secretary's refusal of a new drug application or her withdrawal of approval of an application. It says nothing, however, about the forum for review of a claim of improper approval of an application, such as that raised by plaintiffs.

Section 355(h) provides, in relevant part:
An appeal may be taken by the applicant from an order of the Secretary refusing or withdrawing approval of an application under this section. Such appeal shall be taken by filing in the United States court of appeals for the circuit wherein such applicant resides or has his principal place of business, or in the United States court of appeals for the District of Columbia Circuit....

■ As a general rule, if a statute does not specify the appropriate forum for judicial review of an administrative action, the presumption is that review is available in a federal district court, pursuant to 28 U.S.C. § 1331. *Cronin v. Department of Agriculture*, 919 F.2d 439, 443 (7th Cir.1990). Plaintiffs take the position that because § 355(h) makes no reference to review of a grant of approval, but is limited to reviews of refusal

of approval or withdrawal of approval, the presumption of district court jurisdiction applies to actions challenging approvals. Moreover, they argue, the section concerns appeals by *applicants;* it makes no reference to challenges to approvals because an applicant who wins approval of a drug application has no reason to raise such a challenge. Therefore, as non-applicants, plaintiffs are making a different challenge from the kind Congress contemplated when it enacted § 355(h).

In support of their position that § 355(h) is unambiguous in limiting the courts of appeals' exclusive jurisdiction to the refusal or withdrawal of approval, plaintiffs cite *Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973), and *Upjohn v. Schweiker,* 520 F.Supp. 58 (W.D.Mich.1981), *aff'd,* 681 F.2d 480 (6th Cir.1982). The *Upjohn* case is of limited value. Although the court of appeals affirmed the district court's exercise of jurisdiction over a claim by a drug manufacturer that the FDA had given approval improperly to a new drug application filed by one of the manufacturer's competitors, neither it nor the district court discussed the jurisdictional issue or the effect of § 355(h).

In *Weinberger,* the issue was whether the FDA or the courts should decide whether a drug constitutes a "new drug" or one that is "grandfathered" under the Food, Drug and Cosmetic Act. The Court agreed with the district court that the FDA should make the initial determination to classify a drug as a new drug, that is, one "not generally recognized, among experts ... as safe and effective for use," 21 U.S.C. § 321(p), with this determination subject to review in the district court under the Administrative Procedure Act. The Court indicated that the provision in § 355(h) for exclusive jurisdiction in the courts of appeals would apply only to orders that deny or withdraw approval of a new drug application. *Id.,* 412 U.S. at 651, 93 S.Ct. at 2493.

The Court of Appeals for the District of Columbia has interpreted *Weinberger* as authorizing the district courts to take jurisdiction over actions brought under the Food, Drug and Cosmetic Act that are not provided for in § 355(h). *See Cutler v. Hayes,* 818 F.2d 879, 887 n. 61 (D.C.Cir.1987) (district court had subject matter jurisdiction over challenge to legality of FDA regulations governing review of over-the-counter drugs and progress of the review program). In *Cutler,* the court noted that the Act "contains no single, overarching provision governing judicial review. Instead discrete agency actions are subject to specialized review provisions.... Agency action taken under sections silent in this respect are directly reviewable in a district court...." *Id.*

Defendants contend that neither *Weinberger* nor *Cutler* can be read as supporting district court jurisdiction in this case because the agency actions at issue in those cases involved a simple determination whether a particular drug was or was not a "new drug," whereas this case involves review of the agency's approval or denial of an application for a new drug. Defendants' reading of § 355(h) does not turn on the language of the statute, but focuses on the nature of the review function Congress assigned to the courts of appeals in enacting § 355(h). Defendants maintain that the relief plaintiffs are seeking is essentially the same as the relief available under § 355(h), that is, a review of the adequacy of the FDA's determination that rbST is safe and effective, and that it is unlikely Congress intended to create a bifurcated system of review when the standards for review are the same. They cite *Modine Mfg. Co. v. Kay,* 791 F.2d 267, 270–71 (3d Cir.1986), for the proposition that where a statute is silent about review, courts of appeals have exclusive jurisdiction to hear any challenge that is functionally similar to a challenge for which the court would have explicit authority for review.

Although *Modine* seems to bear on this case, its resolution turned on a question of the reviewability of a particular action by the Environmental Protection Agency under § 1369(b)(1) of the Federal Water Pollution Control Act: the application to a particular company or operation of categorical pretreatment standards. The Court of Appeals for the Seventh Circuit has rejected the Third Circuit's liberal reading of § 1369(b)(1). *See American Paper Institute, Inc. v. U.S. E.P.A.,* 890 F.2d 869, 874 (7th Cir.1989) (fed-

eral courts not authorized to review state-issued water permits). In both *Modine* and *American Paper Institute*, the courts noted the district courts' jurisdiction to hear certain challenges to EPA actions. In *Modine*, the court of appeals noted that the Federal Water Pollution Control Act divided responsibility for judicial review between the federal appellate and district courts, with the district courts authorized to hear EPA enforcement actions and citizen suits against the Administrator for failure to perform a nondiscretionary act or duty. *Modine*, 791 F.2d at 269. I cannot conclude from *Modine* that this court lacks jurisdiction to hear plaintiffs' challenge to defendants' approval of rbST.

Defendants contend that a grant of the relief plaintiffs are seeking (suspension of approval of rbST and further study of its safety and effectiveness) might undercut the courts of appeals' exclusive jurisdiction over FDA refusals to approve new drugs. Defendants do not explain this contention, leaving it unclear how the courts of appeals would be affected by a district court decision requiring the FDA to undertake additional study of an approved drug. As a practical matter, this court can grant plaintiffs their requested relief without interfering with the courts of appeals' jurisdiction. Section 355(h) is not triggered until an application is refused or withdrawn. If the outcome of this lawsuit is that approval of rbST is suspended and defendants are ordered to undertake a new determination of Monsanto Corporation's application for rbST approval, Monsanto would retain all of its rights of direct appeal to the court of appeals and the court of appeals would have the same review powers it would have had if the FDA had denied the Monsanto application in the first place.

Defendants add that because the case is a record review case, the parties do not need to be in district court for factfinding purposes and that both the parties and the courts have a good reason to avoid the duplication of effort that occurs when both the district and appellate court undertake the same record review. I agree that such duplication makes little sense as a practical matter. But in and of itself this factor does not dictate the outcome. The law is replete with instances of such duplication: among them are challenges to adverse decisions of the Social Security Administration, 42 U.S.C. § 405(g), and to nondiscretionary actions of the Administrator of the Environmental Protection Agency, 33 U.S.C. § 1365. If Congress intended that the district courts should hear challenges to approvals of drug applications, the courts cannot decline jurisdiction simply because of potential duplication of effort.

Defendants maintain that plaintiffs' claim for relief is essentially a request that the FDA withdraw its approval of rbST. Although plaintiffs have styled their request as one to have defendants "suspend" the approval of rbST, defendants say that they have no authority to take such an action because they are limited to approving, refusing or withdrawing a new drug application. *See* 21 U.S.C. § 360b(c)(1). To provide plaintiffs with their requested relief, the FDA would have to withdraw the approval already granted. Only the courts of appeals can review withdrawals of approval; therefore, defendants argue, plaintiffs' claims can be heard only by the appellate court. But plaintiffs' challenge is not to a withdrawal; it is a citizen's challenge to an *approval*. Hearing that challenge will not affect the courts of appeals' exclusive jurisdiction to hear *applicant* challenges to withdrawals of drug applications, whether the withdrawals come after the agency has made its original determination or after it has made a supplemental determination pursuant to the order of a district court.

Furthermore, granting plaintiffs the relief they request would not be the functional equivalent of a withdrawal. Although defendants contend that they have no power to suspend the approval of an application, this contention is belied by § 360b(f), which grants the Secretary the power to revoke, withdraw, or *suspend* the approval of any application. The commissioner seems to have similar powers to "stay or extend the effective date of an action pending or following a decision on any matter," 21 C.F.R. § 10.35, and to approve "an application that previously has had its approval refused, suspended, or withdrawn." 21 C.F.R. § 514.120.

A close reading of § 360b(f) reveals another reason to reject defendants' argument that § 355(h) should be read as applying to any challenge to an agency's approval of a new drug application. Section 360b(f) suggests that the FDA can re-evaluate its prior approval of a new drug application without withdrawing approval and without invoking the exclusive appellate court review provisions of § 355(h).

Defendants cite *Suburban O'Hare Comm'n v. Dole,* 787 F.2d 186, 192 (7th Cir. 1986), *cert. denied,* 479 U.S. 847, 107 S.Ct. 169, 93 L.Ed.2d 106 (1986), and *Telecommunications Research and Action Ctr. v. FCC* (TRAC), 750 F.2d 70, 75 (D.C.Cir.1984), for the proposition that any ambiguity in the provisions for judicial review should be resolved in favor of exclusive jurisdiction in the courts of appeals. In *Dole,* however, the question was whether the court of appeals should take jurisdiction over four separate challenges to Federal Aviation Authority orders when exclusive jurisdiction applied to only three of the four. The court held only that "[w]hen an agency action has two distinct bases, one of which provides for exclusive jurisdiction in the courts of appeals, the entire decision is reviewable exclusively in the appellate court." *Dole,* 787 F.2d at 192. *Dole* does not address situations like this one where no basis for the agency action is exclusively within the jurisdiction of the courts of appeals. *TRAC* holds that the court of appeals has exclusive jurisdiction over an interlocutory appeal for a writ of mandamus to require the FCC to decide matters pending before it because the court has exclusive review over final actions by FCC. "[W]here a statute commits final agency action to review by the Court of Appeals, the appellate court has exclusive jurisdiction to hear suits seeking relief that might affect its future statutory power of review." *TRAC,* 750 F.2d at 72. Defendants argue correctly that this court should not exercise jurisdiction over plaintiffs' claim if doing so would affect the future jurisdiction of a court of appeals. To that extent, *TRAC* is helpful. However, the case sheds little light on the underlying question whether hearing a challenge to an allegedly improper approval of a drug is likely to affect the exercise of the exclusive jurisdiction granted to the court of appeals.

I conclude that defendants have failed to show that the courts of appeals have exclusive jurisdiction over plaintiffs' claims under the Food, Drug and Cosmetic Act.

## II. LABELING DECISIONS

█ Rather than requiring labeling of products derived from animals treated with rbST, defendants have issued guidelines for voluntary labeling. *See* 59 Fed.Reg. 6279 (Feb. 10, 1994). Plaintiffs contend that failure to require labeling constitutes "misbranding" under 21 U.S.C. § 321(n) and that defendants' decision on labeling may be set aside under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), as "arbitrary, capricious, an abuse of discretion or not otherwise in accordance with law." Relying on the Supreme Court's decision in *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), defendants argue that their decision to allow voluntary labeling on milk and milk products is an unreviewable action committed to their discretion under § 701(a)(2) of the APA, making § 706 inapplicable to this case.

Section 701(a) allows for judicial review of all agency action "except to the extent that— (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." In *Chaney,* the Supreme Court rejected a challenge by death row inmates to the FDA's refusal to act to prevent executions from being performed with drugs not approved for that purpose. The Court held that the inmates' request to have the drugs at issue labeled "unapproved and unsafe for human execution" was judicially unreviewable because it was an enforcement action committed to agency discretion. The Court rested its holding on two grounds. First, the lack of "judicially manageable standards" to assess the FDA's decision not to investigate or attempt to prevent unapproved uses of approved drugs meant that the agency's decision was committed to its absolute discretion under § 701(a)(2). *Id.* at 830, 105 S.Ct. at 1655. Second, no presumption of reviewability applies to an agency's decision not to take certain enforcement actions; indeed, the pre-

sumption flows the other way. *Id.* at 831, 105 S.Ct. at 1655. *See also Arnow v. U.S. Nuclear Regulatory Comm'n,* 868 F.2d 223, 233–34 (7th Cir.1989) (presumption against reviewability can be rebutted only by demonstrating that either the statute in question or the agency's regulations have limited the agency's discretion).

This case is unlike *Chaney.* Plaintiffs are not asking the FDA to investigate alleged unapproved uses of rbST or to require distributors to label milk products as derived from cows treated with a drug not approved for that purpose by the FDA. Simply put, plaintiffs are not asking the agency to undertake enforcement actions, as was the case in *Chaney* and *Arnow.* They are asking only that the FDA reconsider the necessity of labeling products containing milk from rbST-treated cows.

Defendants do not explain how such a review would constitute an enforcement action. They do not argue that the Food, Drug and Cosmetic Act provides no legal standards against which to measure their decision not to require labeling of dairy products derived from rbST-treated cows. They appear to rely on *Chaney* because the case involved a labeling decision found to be unreviewable. But the key to the holding in *Chaney* was that plaintiffs sought the FDA to investigate an unapproved use of an approved drug. Such a request implicated enforcement decisions that are not suited to judicial review because of the agency's need to be free to make decisions concerning which violations to pursue, determine the likelihood of success in prosecuting a particular action and assess the congruence between the enforcement action and the agency's goals, and the adequacy of the agency's resources. *Id.,* 470 U.S. at 831, 105 S.Ct. at 1655. None of these determinations is at issue here. Plaintiffs ask only that, as part of the FDA's reconsideration of the safety and effectiveness of rbST, the agency reconsider whether the approved use of the drug requires labeling. Such a request is judicially reviewable.

Defendants contend that even if plaintiffs' labeling claim is found to be reviewable, it cannot be reviewed at this time because plaintiffs have failed to exhaust their administrative remedies on this issue. Both sides have made assertions about the steps that have been taken to obtain review and to exhaust available remedies but neither side has submitted affidavits or other evidence on this point. Thus, on this motion to dismiss, I must accept as true plaintiffs' allegations to the effect that they have exhausted their administrative remedies.

From the present record, I conclude that plaintiffs may pursue their claim that defendants acted arbitrarily, capriciously and beyond their discretion when they decided to make labeling voluntary.

## III.  STANDING

■ Determining whether plaintiffs have standing to maintain this action under either the Food, Drug and Cosmetic Act or the National Environmental Policy Act requires a "two-part inquiry that considers both constitutional limitations of federal court jurisdiction and prudential limitations in its exercise." *Family & Children's Ctr., Inc. v. School City of Mishawaka,* 13 F.3d 1052, 1058 (7th Cir.1994) (internal quotations omitted). The constitutional requirements for standing derive from Article III's mandate that federal jurisdiction extends only to those situations in which a plaintiff can demonstrate a "case or controversy" between himself and the defendant. *Id.* at 1058. Article III standing has three components: 1) an injury or threat of injury; 2) traceability of the injury to the defendant's conduct (causation); and 3) the likelihood that a favorable decision would provide the plaintiff with a remedy (redressability). *Id.* (citing *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)).

■ To meet the first requirement of standing, plaintiffs must allege injuries or threatened injuries that are "concrete and particularized" and show that the plaintiff has "an actual stake in the outcome [of the case] that goes beyond intellectual or academic curiosity." *Family & Children's Ctr.,* 13 F.3d at 1058 (internal quotation marks omitted). *See also Schmidling v. City of Chicago,* 1 F.3d 494, 498 (7th Cir.1993) (injury or threat "must be both real and immedi-

ate, not conjectural or 'hypothetical'"). However, alleged injuries need not be particularly severe or costly; "even a minor or non-economic injury will satisfy the strictures of Article III." *Family & Children's Ctr.*, 13 F.3d at 1058. The United States Supreme Court has explained that the requirement of a particularized injury "mean[s] that the injury must affect the plaintiff in a personal and individual way." *Lujan*, — U.S. at —, 112 S.Ct. at 2136. The determination whether an injury has occurred or is threatened does not lend itself to precise calculation and requires careful consideration of the individual circumstances of each case. *Schmidling*, 1 F.3d at 498. A plaintiff satisfies the second and third elements of the Article III standing test by showing that his injury "fairly can be traced to the challenged actions and is likely to be redressed by a favorable decision." *Schmidling*, 1 F.3d at 498.

■ In addition to the constitutional requirements, plaintiffs must demonstrate compliance with the prudential elements of standing. In cases challenging the actions of federal agencies, these requirements are set out in 5 U.S.C. § 702 (judicial review of agency action): plaintiffs must demonstrate they are within the "zone of interests" Congress sought to protect by enacting the statutes under which the action is brought. *Banks v. Secretary of Indiana Family & Soc. Serv.*, 997 F.2d 231, 240–41 (7th Cir. 1993). The Court of Appeals for the Seventh Circuit has explained that satisfying the zone of interests test "is not especially demanding." *Id.* A plaintiff need demonstrate only that his claim has a "plausible relationship" to at least one of the policies or concerns that motivated Congress to take legislative action." *Id.* at 242 (internal citations omitted). Furthermore, the zone of interests inquiry begins with the presumption that all plaintiffs who meet Article III's standing requirements have prudential standing to challenge actions by federal agencies. *Id.* All that remains to be determined is whether Congress intended to preclude a certain class of plaintiffs from bringing an action. *Id.*

With these general principles in mind, I turn to the question whether plaintiffs have standing under either of the acts at issue. Defendants contend that none of the plaintiffs satisfy the injury-in-fact requirement because of the speculative nature of their alleged injuries. Their sole challenge to plaintiffs' standing on traceability and redressability grounds concerns defendants' failure to mandate labeling claims and is based on their contention that *Chaney*, 470 U.S. 821, 105 S.Ct. 1649, bars redress for such a challenge. I find this argument unpersuasive for the same reasons I found *Chaney* inapplicable to plaintiffs' labeling claim.

In deciding the standing issue, I take as true all of plaintiffs' well-pleaded allegations and draw all reasonable inferences in their favor, as is necessary in deciding a motion to dismiss. *Family & Children's Ctr.*, 13 F.3d at 1059.

### A. Standing under the Food, Drug and Cosmetic Act

#### 1. Article III standing

##### a. dairy farmers

■ All of the dairy farmers (plaintiffs Steve and Karen Sponem, John Scheidegger, Dennis Jelle, Steve Rosga, Charles Remy, Scott Rosga, Marlin Wild, Gary Gruenenfelder, Tim and Wendy Hendrickson, Bryon and Pamela Krahenbuhl, Steve and Stephanie Zimmerman, Joe and Linda Zangl, Clarence and Beth Thurk, John and Betty Schmidt, Gordon and Doris Belling, Arnold and Marilyn Oechsner, Michael Cannell, Francis Goodman, John Kinsman, Bruce and Shelley Krug) have made identical allegations. They contend that defendants' approval of rbST "will cause significant milk surplus and decreased consumer demand for milk, lowering milk prices and costing a significant number of dairy farmers their jobs." Their complaint cites a report from the United States Office of Management and Budget predicting a two percent fall in milk prices over the next six years. Defendants contend that the farmers' allegations are mere speculation about the future effects of the approval of rbST and that plaintiffs fail to state a particularized injury traceable to defendants' actions, as required by Article III. Although the allegation that some dairy farmers will go out of business does not state a particular-

ized claim in the absence of an allegation that any of the named plaintiffs will go out of business, the allegation that milk prices will fall does state such a claim. The alleged fall in milk prices will affect all dairy farmers adversely, including plaintiffs.

Defendants contend that it is insufficient to base an alleged injury on speculation about future milk prices because the speculation relies on predictions about how farmers will use rbST and the effect their use will have on the milk market. Although defendants are correct that completely speculative theories of traceability can be disregarded, even at the motion to dismiss stage, *United Transportation Union v. ICC*, 891 F.2d 908, 912 (D.C.Cir.1989), the dairy farmers' reliance on the principles of supply and demand is not so speculative as to compel dismissal. At this stage of the litigation I must accept plaintiffs' allegations as true. The laws of supply and demand are a firm enough foundation upon which to base causation at this point. I find that the dairy farmers have established an injury or threat of injury.

b. consumers

■ Plaintiffs Stauber and Stoddard are both consumers of milk and milk products. They allege that their use of dairy products has been inhibited because they cannot tell whether a given product comes from cows treated with rbST and they fear that consuming products from such cows would be harmful to their health. Additionally, plaintiff Stoddard contends that as a parent, he does not allow his son to consume milk products out of concern for his son's health. Defendants maintain that plaintiffs' fears are too speculative to establish injury because they are based only an unsubstantiated fear of harm and that even if plaintiffs' fears prevent them from consuming milk products, their fears may be alleviated by voluntary labeling.

I find that the injuries alleged by the consumer plaintiffs are sufficient. These plaintiffs are being harmed by their inability to consume milk products that they know are free of milk from rbST treated cows. Voluntary labeling by manufacturers may mitigate some of the harm suffered by these plaintiffs, but it is not a complete cure for plaintiffs' injury. Many food items contain milk or milk products that will not be separately labeled, even if all milk distributors and cheese makers choose to identify their milk and cheese. The complete cure that plaintiffs seek is a change in the FDA's decision to approve rbST. Therefore, I conclude that the consumer plaintiffs satisfy the requirements for Article III standing.

c. sellers of dairy products and related items

■ Plaintiffs Mieves, the owner of a cheese company; Piper, a restaurant owner; Stoer, the owner of a milk bottling company and dairy stores; North Farm Cooperative, a natural food wholesaler; and Mifflin Street Community Cooperative, a food cooperative, all allege that the approval of rbST will affect their businesses by reducing the demand for milk and thus reducing their revenue. Additionally, Mieves alleges that the approval of rbST might affect the production of cheese, Piper alleges that the supply of some products she uses in her restaurant may be affected, and plaintiff Hardin, the editor of an independent farm journal, predicts that he will lose subscribers when dairy farmers go out of business.

These allegations are too speculative to meet Article III's standing requirements. They rely on much more attenuated presumptions then do the dairy farmers' allegations, such as the reduction in consumer confidence in dairy products, the bankruptcy of dairy farms and the possible effects of rbST on production of dairy products. Although ultimately these speculations may prove to be correct, they do not provide a present basis for standing. Therefore, these plaintiffs will be dismissed from the law suit.

d. health care professionals and counselors

■ Plaintiff John Barnes is a veterinarian; plaintiff Connie Barnes is a nutritional educator; and plaintiff Laura Berger is a registered nurse. All three contend that the approval of rbST will interfere with their ability to counsel or treat their patients. John Barnes alleges that he may be subject to malpractice liability for prescribing rbST

if it proves to be unsafe and that he will come under increased pressure to provide unapproved antibiotic drugs for the cows he treats because the use of rbST may subject cows to greater instances of drug-resistant infections and diseases. Connie Barnes and Laura Berger contend that they will be unable to fulfill their professional obligations to their patients because they are afraid to recommend consumption of dairy products. None of these plaintiffs has stated an injury or threatened injury sufficient to demonstrate that they have standing to maintain this suit.

John Barnes's concerns about possible malpractice liability are highly speculative. He cannot argue he is injured by being forced to violate the law. Similarly, Connie Barnes and Laura Berger cannot claim that they will be injured by giving their clients what they believe is sound advice. Therefore, these plaintiffs will be dismissed from this action.

e. Foundation on Economic Trends

■ The Foundation on Economic Trends is a non-profit organization involved in environmental, economic and ethical issues raised by the use of biological and industrial technology. (None of the individual plaintiffs allege that they are members of the organization.) The foundation contends that it has been injured by the approval of rbST because it has had to expend resources to advocate against the approval of rbST and because its ability to provide information to the public about rbST and related issues has been limited.

■ The foundation relies on *Havens Reality Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), to establish that a drain on an organization's resources is sufficient to satisfy the injury requirement of Article III standing. However, *Havens* concerned injuries alleged to have been caused by the defendant's impairment of the plaintiff's ability to carry out its organizational purposes of providing counseling and referral services to low income people seeking homes. In finding that these allegations were sufficient to allege a concrete injury, the Supreme Court gave no consideration to expenditures the organization may

have made to finance the lawsuit before it. *Havens* does not stand for the proposition that an organizational plaintiff may establish an injury for standing purposes simply by alleging that its involvement in the lawsuit or its efforts to gain administrative relief have drained its resources and impaired its ability to conduct other activities. *See Haitian Refugee Center v. Gracey,* 809 F.2d 794, 799 n. 2 (D.C.Cir.1987) ("Article III injury does not arise from "an injury that is only a by-product of the suit itself" but "requires an injury *with a nexus to the substantive character* of the statute or regulation at issue") (citing *Diamond v. Charles,* 476 U.S. 54, 69–70, 106 S.Ct. 1697, 1707–08, 90 L.Ed.2d 48 (1986) (emphasis in *Haitian Refugee Center*)). In order to establish an injury, an organizational plaintiff must demonstrate that the alleged injury relates to the substantive character of the action being challenged.

The foundation's allegations establish no more than that its resources are being sapped by this litigation and by the activities the foundation has engaged in to oppose the approval of rbST. To grant standing on these allegations would eviscerate the constitutional requirement of the standing doctrine: any plaintiff with a disagreement with the government could manufacture an injury to establish standing simply by filing a lawsuit. *See Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 482–83, 102 S.Ct. 752, 764–65, 70 L.Ed.2d 700 (1982). The foundation's Food, Drug and Cosmetic Act claim will be dismissed.

2. *Prudential Standing Under the Food, Drug and Cosmetic Act*

■ Defendants concede that the consumer plaintiffs fall within the zone of interests of the Food, Drug and Cosmetic Act but argue that the dairy farmers do not. I agree that the consumer plaintiffs have standing to pursue this action because the purpose of the Food, Drug and Cosmetic Act is to protect consumers from unsafe food, drugs and cosmetics. The only remaining question relates to the dairy farmers' standing.

Plaintiffs contend that the farmers have an interest in providing their customers with safe and wholesome products and that this interest has a "plausible relationship" to the purposes of the Food, Drug and Cosmetic Act. Defendants recognize that the purpose of the act is to protect consumers from unsafe food, drugs and cosmetics but they maintain that the farmers are not within the zone of interests of the act by analogy to the decision in *Block v. Community Nutrition Inst.,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). In *Block,* consumers challenged the Secretary of Agriculture's milk marketing orders under the Milk Marketing Act of 1937. The Supreme Court held that Congress intended milk handlers and producers, but not consumers, to have the right to sue under the Milk Marketing Act. *Id.* at 346–47, 104 S.Ct. at 2454–55. The act was intended to benefit milk handlers; allowing consumers to sue "would severely disrupt [the] complex and delicate administrative scheme." *Id.* at 348, 104 S.Ct. at 2455. According to defendants, *Block* is the "mirror image" of this case: it is intended to effectuate statutory safety and effectiveness requirements, not to protect the economic interests of producers and consumers. Thus, they argue, the reasoning of *Block* mandates the conclusion that Congress intended to allow consumers but not producers (including dairy farmers) to bring actions under the Food, Drug and Cosmetic Act and only to raise safety and effectiveness issues.

I agree with defendants that Congress did not intend to authorize challenges to drug approvals that are based on alleged economic harm. Although farmers have interests closely intertwined with those of consumers, in this case the farmers have alleged injury only in the form of predicted economic harm. The Food, Drug and Cosmetic Act was enacted and amended to protect consumers from impure, adulterated and dangerous food, drugs and medical devices, not to protect manufacturers, producers or distributors against adverse economic consequences. *See, e.g., 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States,* 340 U.S. 593, 596, 71 S.Ct. 515, 518, 95 L.Ed. 566 (1951) (purpose of Act is to keep impure and adulterated food and drugs out of chan-

nels of commerce; it was intended to protect consumers who are unable to protect themselves); *United States v. Sullivan,* 332 U.S. 689, 696, 68 S.Ct. 331, 335, 92 L.Ed. 297 (1948) (purpose of Act is primarily to protect consumers from dangerous products); *United States v. Lexington Mill & Elevator Co.,* 232 U.S. 399, 409, 34 S.Ct. 337, 340, 58 L.Ed. 658 (1914) (primary purpose of Congress was to prevent injury to the public health by the sale and transportation in interstate commerce of misbranded and adulterated foods).

## B. *Standing under NEPA*

Plaintiffs did not discuss the claimed effects of defendants' alleged violations of the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C), upon each of the plaintiff groups. The complaint contains only a single paragraph on this issue, which reads in full as follows:

> The FDA's approval of rBGH was accompanied by an environmental assessment (EA) and a finding of no significant impact (FONSI). The EA and FONSI failed to address many of the significant environmental impacts associated with rBGH including, *inter alia,* health impacts on dairy cows, shifts in land use patterns, feasible alternatives to rBGH such as rotational grazing, the potential health risks to consumers caused by increased IGF–1 and antibiotic residues and the economic impacts on family dairy farms.

Defendants contend that plaintiffs do not fulfill the requirements of either Article III or prudential standing. Citing *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1514 (9th Cir.1992), plaintiffs respond that their complaint is sufficient because it identifies a procedural harm: the FDA's failure to consider the environmental issues related to the approval of rbST. They contend that this defect alone is sufficient to confer standing.

In *Mumma,* the Ninth Circuit explained that standing under the National Environmental Policy Act can be based on the failure of an agency to comply with the Act's requirement to consider the environmental impact of its actions because the Act is primarily a procedural statute designed to guarantee

that agencies give adequate consideration to the environmental effects of their actions. *Mumma,* 956 F.2d 1508. To the extent that *Mumma* can be read as holding that Article III standing can be based on a procedural violation of the National Environmental Policy Act without demonstrating a concrete injury, it has been overruled by *Lujan,* —— U.S. ——, 112 S.Ct. 2130. The Supreme Court has held that the allegation of a procedural harm may relieve a party of the need to demonstrate causation and redressability but not of the need to allege a concrete injury. *Id.,* —— U.S. at —— & nn. 7 & 8, 112 S.Ct. at 2142 & nn. 7 & 8.

■ In *Lujan,* the Court held that a plaintiff may have standing to challenge a violation of a procedural requirement "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Id.,* —— U.S. at —— n. 8, 112 S.Ct. at 2143 n. 8.[1] To explain the relationship between a violation of a procedural right and a concrete injury, the Court contrasted the example of a person living next to a dam with a person living across the country. The near neighbor would have standing to challenge the dam's construction if the agency in charge failed to prepare an environmental impact statement; the person across the country would not have standing to raise the same alleged violation of a procedural right. *Id.,* —— U.S. at —— —— n. 7, 112 S.Ct. at 2142–43 n. 7. As the Court's hypothetical illustrates, plaintiffs must establish more than the agency's failure to observe a procedural requirement before they can bring suit under the National Environmental Policy Act to compel defendants to consider the environmental issues they may have ignored. Plaintiffs must allege a concrete harm that these omissions have caused them or threaten to cause them in the future.

■ Plaintiffs do not state in their complaint what particular injuries have been or will be caused them by the FDA's failure to

give full consideration to the economic effects of rbST approval. The only exception to this shortcoming is that plaintiffs do include the statement in their complaint that plaintiff Foundation on Economic Trends has suffered a injury in the form of a lack of information about the environmental effect of rbST. As for the other plaintiffs, in deciding whether they have standing under the National Environmental Policy Act, I can consider only the injuries they have identified in regards to their claims under the Food, Drug and Cosmetic Act because they have alleged no others. I have already concluded that the farmers and the consumers have stated concrete injuries and the sellers, health care professionals and the foundation have not. The injuries alleged by the farmers and consumers are sufficient to satisfy the concrete injury requirement for the National Environmental Policy Act claim.

The fact that the consumer and farming plaintiffs have alleged the violation of procedural requirements and a concrete injury relating to that violation does not finish the standing inquiry. It still must be determined whether the interests asserted by these plaintiffs fall within the zone of interests that Congress intended the National Environmental Policy Act to protect. Defendants point out correctly that the interest asserted by the farmers is purely economic. As such, it falls outside the zone of interests protected by the act. *See, e.g., Nevada Land Action Ass'n v. U.S. Forest Service,* 8 F.3d 713, 716 (9th Cir.1993). Therefore, the dairy farmers do not have standing under the National Environmental Policy Act.

Defendants have not suggested any basis for concluding that the consumer plaintiffs' claims of potential harm fall outside the environmental act's zone of interests. Although plaintiffs' allegations are not entirely clear on this point, when they are construed in plaintiffs' favor, they are sufficient to allege an environmental impact on human health. Therefore, the consumers have standing to maintain their claims under the National En-

---

1. The Court of Appeals for the Ninth Circuit has recognized that *Lujan* establishes the necessity of establishing in Environmental Policy Act cases both a showing of concrete injury and the procedural harm "that environmental consequences might be overlooked as a result of the deficiencies in the government's analysis under environmental statutes." *Salmon River Concerned Citizen v. Robertson,* 32 F.3d 1346, 1354–55 (9th Cir.1994) (citations omitted).

vironmental Policy Act. This holding addresses standing only. I express no opinion whether the act requires the kind of environmental assessment the plaintiffs contend was necessary.

## ORDER

IT IS ORDERED that defendants' motion to dismiss the complaint for lack of subject matter jurisdiction is GRANTED with respect to the claims in Counts I, II, and III of plaintiffs John and Connie Barnes, Steve and Karen Sponem, John Scheidegger, Dennis Jelle, Steve Rosga, Charles Remy, Scott Rosga, Marlin Wild, Gary Gruenenfelder, Tim and Wendy Hendrickson, Bryon and Pamela Krahenbuhl, Steve and Stephanie Zimmerman, Joe and Linda Zangl, Clarence and Beth Thurk, John and Betty Schmidt, Gordon and Doris Belling, Arnold and Marilyn Oechsner, Michael Cannell, Francis Goodman, John Kinsman, Bruce and Shelley Krug, Laura Berger, Peter Hardin, Jim Mieves, Odessa Piper, Russell Stoer, Foundation on Economic Trends, Mifflin Street Community Cooperative, and North Farm Cooperative. In all other respects defendants' motion to dismiss is DENIED.